And we will move on to our third case for this morning, BMO Harris Bank N.A. v. Edward E. Gillen Company. The other way around, Edward E. Gillen Company and BMO Harris Bank N.A. v. Insurance Company of Pennsylvania. Mr. Kirtley, we're ready for you whenever you're ready. Thank you, Your Honor. May it please the court, counsel, John Kirtley, appearing on behalf of BMO Harris Bank. The dispute before you is on the one hand a bonding company that loaned money in the form of a supersedious judgment bond, and on the other hand, a senior secured lender of that same debtor. For F&D to prevail here, it must convince you that the $1.2 million which the ICHSOP, and I apologize for using acronyms, but they refer to themselves as ICHSOP, the Pennsylvania Insurance Company, that the $1.2 million that ICHSOP agreed to pay Gillen. Why don't you just call them the insurer? I'll call them the insurer. F&D must convince you that the $1.2 million that the insurer agreed to pay Gillen, money that was paid in settlement of Gillen's lawsuit against the insurer, is somehow not a Gillen asset. This is an extraordinary hurdle that F&D must clear. Now, I think it's important to frame for you what this case is not. This is not the situation of a tort victim seeking recourse against an insurance policy, an insurer arguing that that tort victim should recover on a dollar-for-dollar basis outside bankruptcy. Why isn't it exactly that situation? There's a victim of a tort, it's covered by insurance, and instead of having a direct payment by the insurer, we have a two-step. We have a payment by the insurer, it's converted into a supersedious bond, the bond is paid, and then out of the proceeds from the payment of the bond, the victim is reimbursed. Why does the two-step make this any different from a direct payment by the insurer? Because when F&D issued the bond, it was in the position of extending credit to Gillen. And when Gillen then, on his own nickel and his own dime, brought the claims against the insurer. Yeah, but you aren't explaining why the money should now be diverted to the secured creditor rather than the victim of a tort. I believe it matters in what time and who, in fact, is responsible for procuring an asset. Well, you keep saying we believe it matters. This is a question, so far as I can figure out, of Wisconsin law. And so I looked carefully through your brief for a discussion of some principle of Wisconsin law that would make it matter whether there's this intermediary between the insurer and the victim. And I didn't see any. Is there some Wisconsin statute or a decision of the Supreme Court of Wisconsin saying that it matters that there is an intermediary between the insurer and the ultimate payment and the victim? Your Honor, I can't cite to you a specific case that deals specifically with this fact scenario under Wisconsin law. But the Wisconsin cases clearly articulate the Article 9 priorities which apply here. That when Gillen goes out and sues an insurer and recovers, and there's going to be no doubt about that, it's clear in the record, it's in the settlement agreement itself, that the insurer was agreeing to pay Gillen $1.2 million. There's no question under just a garden variety application of Article 9, Wisconsin law's adoption of Article 9, that that is an asset. But the basic answer is no. There's no case in Wisconsin that says this. But there's no case to the contrary either. There's no case that says it doesn't matter. Wisconsin has, of course, taken a very firm position. It's a direct action state. Taken a very firm position that victims of tort should be able to recover notwithstanding the insolvency of the tort teaser and notwithstanding the insolvent party's security interests. And you seem to be saying that state policy just vanishes if the transaction is handled in two steps rather than one. And, of course, Wisconsin could have that position. But I'm looking for some case or statute that says Wisconsin has that position. I think Wisconsin recognizes that when a tort victim brings a direct action claim, it has a right for that recovery. But here, the tort victim, Miney, didn't bring such a direct action claim. And, in fact, there was a ruling that Gillen owed the tort victim. And so now Gillen has to pay the tort victim. And how does it pay it? It went out and secured a loan from a lender. And that's why we submit this is a situation very different than what you're suggesting, this two-step. It secured a loan from the lender because the insurer breached its contract, right? Exactly. Okay, so why isn't Fidelity and Deposits' tactic of getting the assignment of the judgment from, is it Maine or Miney? I believe it's pronounced Miney. Miney? Okay. Given that assignment, why isn't it simply in the position of the tort victim? Well, because it didn't just take an assignment. In the record, it's clear that the judgment was satisfied. Is the judgment, I mean, has it been erased from the books? Has notice been filed that it's because Miney is the assignee of that and is counting on this money from the insurance company? No, Miney received the money from F&D. F&D is counting, though, on as the assignee of that judgment. But it didn't take an assignment of any rights vis-à-vis the insurer's policy. It merely took, and the record is clear, it took an assignment of the judgment and it agreed that the judgment was satisfied, and it did this, and it extended this credit to Gillen based on what it perceived to be Gillen's creditworthiness as of 2010. Okay. Sure. It agreed the judgment had been satisfied by which payment? The payment that F&D made to Miney. Satisfied Miney. But wasn't it two steps? Didn't the first insurance company pay the first million up to its policy limits? And then as a result of this supersedis bond, F&D, Fidelity, pays the balance of the judgment. So the original tort victim has been satisfied, but now F&D is standing in the position of that original tort victim to get the money. I'm sorry, Your Honor. To get the balance of the money, the other portion. But when F&D paid that balance, it required, one, a satisfaction of Miney's judgment against Gillen. So that underlying judgment is satisfied, and it received an assignment of Miney's judgment against Gillen, which put Miney in the position of having a judgment lien against Gillen. I don't understand. Those two statements seem to contradict each other. I would completely agree. But what is clear is that it did not acquire, it did not obtain an assignment from Miney of some rights Miney had against the Insurer's Policy. There is no assignment, and you won't find that in the record. And it is strange that it was both satisfied and then purported to be assigned. But what is absolutely clear, we submit, is that in that step of the process, F&D did not acquire rights. It did not suddenly stand in the shoes of the insured, I'm sorry, of a tort victim under that policy and thereby somehow trump the rights. That's the conclusion. You think it gets transformed somehow at that step from a third-party tort case to just a bunch of contractual relations between, you know, Fidelity and Gillen and the insurer, the Pennsylvania company, so to speak. And so I guess going back to Judge Easterbrook's original question, you know, sort of when does alchemy take place? I mean, why doesn't it just pass the tort status through? We believe it doesn't because F&D has to affirmatively take some action. Wisconsin has a direct action statute. It has to take some action if it believed it had rights under that assignment of judgment to proceed against the insurer. It didn't. The party that proceeded to assert rights against the insurer was Gillen, and Gillen is BMO's borrower. And when Gillen acquired the rights to $1.2 million. And he's bringing the bad-faith refusal to defend and indemnify case, right? That's what Gillen is doing. The measure of damages of which may not be the same is simply an action on the policy. Absolutely, Your Honor. That's an important point as well. Counsel, let me ask you, in your brief, you seem to want to take on the Fifth Circuit's decision in matter of Edgeworth and disagree with that. Do you think we need to disagree with them? I don't think you ever need to reach that point because you have to first conclude that fidelity actually you have to conclude that these are when the insurer tenders the $1.2 million, you have to first conclude that's insurance policy proceeds rather than settlement proceeds from Gillen's lawsuit against the insurer. So we don't think you even have to reach that question. But if you decide that you need to put all these bankruptcy cases in your mix of things you're considering, and if you believe that, in fact, there's a question of whether these are insurance proceeds alone and, therefore, you have to look at the Fifth Circuit Edgeworth versus Vitek cases, then you'd have to reach that question. And we've submitted in our briefs why we think, based on an asset protection rationale, that Vitek rather than Edgeworth is more important. Look at the facts of Edgeworth. Edgeworth was a situation where you had malpractice victims, tort victims, who were trying to sue a doctor who filed bankruptcy to try to get at his insurance company directly. Now, interesting, in Edgeworth, Edgeworth says that we're looking to who the money is actually going to be paid to. And I submit, look here, the money being paid by the insurer here is actually being paid to Gillen. That makes it very different than the two-step process Judge Easterbrook was talking about. The facts before you are that the insurer agreed to pay Gillen, and now you have to decide who prevails as between two lenders to Gillen, because that's all F&D was when it issued the supersedious bond. Yeah, well, but that just restates my question. Forget about the supersedious bond. Suppose victim of tort loses a million dollars and there's a million dollars in insurance. And instead of writing a check directly to victim, insurer writes a check to Gillen, which endorses it to victim. If I understand your position, at that point, your security interest jumps in, and you get the million dollars and the victim gets nothing. And what the Fifth Circuit's grappled with is that— Forget about the Fifth Circuit. It's not Wisconsin law. Why should the fact that the insurer writes the check to Gillen, which endorses it to the victim, mean that the money ends up with the bank rather than the victim? Because it's an asset of Gillen. When Gillen has a claim against an insurance company for bad faith, it's an asset of Gillen. What in Wisconsin law says that this formal step, that who the insurer names as the payee on the check, is enough to redirect a million dollars from the victim to the bank? Wisconsin's adoption of Article 9 of the Uniform Commercial Code. Because that says that a lender like BMO has interest in all assets, including intangibles, this right of— Then I don't know why you're not arguing that the bank should get the million dollars, even if the insurer tried to write the check naming victim as payee. If I said to the contrary, I don't mean to. I believe we get the million dollars. Wisconsin law is perfectly plain that if the insurer writes the check naming victim as the payee, victim gets the money and secured lender gets nothing. That's perfectly clear in Wisconsin law. And I'm trying to figure out why it should make a difference if the insurer puts a different name on the check. The economic structure of the transaction is identical. Because it makes a difference, I believe, when the difference between protecting a tort victim, and there's a rationale for why a tort victim should be protected, and that's reflected in the Edgeworth cases, Judge Hamilton, and there's a difference between protecting a tort victim and then the relative positions of competing creditors of a debtor. And it makes a huge difference in our view. Counsel, let me go back to this puzzle of a judgment that is both satisfied and assigned. If it had been only assigned, then why wouldn't F&D be in the position of the victim? I believe that we require an actual assignment of policy rights against the insurer, which didn't take place. But the satisfaction, I think, factually just makes that not relevant. So if they had done the paperwork a little differently, the judgment's not satisfied, but the mining company assigns its rights under the judgment including, don't the rights against the insurance company go with that judgment? But if they had at least made it explicit, then you would lose. I don't think we lose because that's not the facts of what happened. I'm asking you about that hypothetical. That hypothetical, you still don't have the tort victim suing directly. You have an insurer purporting to stand in the shoes, and then I think you'd have the issue of for whose benefit, who prevails in that priority situation. I think you would have the Edgeworth-Vitek dichotomy, for which we think the better ruling is Vitek. But that isn't, in fact, what happened. The facts here are plain. Gillen pursued the claim in its own name, and that this really can be no question. We think that that is subject to BMO's security agreement. Thank you. All right. Thank you very much. Mr. Hummel. Your Honor, Brandon Hummel on behalf of Fidelity and Deposit Company of Maryland. Your Honors, I'd like to respond to a couple points and clarify a couple points raised during the first section of the argument, the first of which is F&D, I'll refer to them as short. It's not just a lender. It's a surety, and a surety has a number of equitable rights on top of just supersedis bond. And another point of clarification is that, yes, there was a judgment entered against F&D on its bond. There was never a release of the minor judgment itself. There was a specific assignment of that, and as a result of the assignment. They have been paid, though, right? Yes, they have been paid. The minors are fully made whole. Yes, they have been made whole, Your Honor. And the point here is that F&D performed under its supersedis bond really more in the nature of a performance bond, and it obtained certain equitable rights as a result of that. On top of that, they have a very specific assignment from MINA to proceed against funds that would allow for reimbursement. Now, if you look at the insurance policy issue here, it is to protect against the dissipation of assets as a result of the tortious conduct committed by Gillen. Gillen never paid. Gillen is seeking indemnification for amounts it never paid. In effect, it's seeking a windfall. So Gillen seems to be in a position of a company with no money, and it's gone out and gotten a lot of sources of money that it can't satisfy, and so the problem before us is how Wisconsin sorts out all of that because it certainly seems as a state to have a preference for making sure that the victim of the tort is compensated. The victim of the tort here is compensated, so have they structured this in a way that still leaves the victim of the tort as a concerned party or is nobody saying they're going to have to pay any money back at this point. They're off and happy, I'm guessing. Your Honor, I agree with you. So now are we actually over in the realm of commercial law where we just have to decide who bears the loss of the fact that Gillen is a bad business partner? No, Your Honor, I would respond that that's not the situation because what's happened here. So could the minors have to pay back some of the money? No, minors not. They don't stand any risk anymore of not. Mina does not stand additional risk, but as a surety F&D has fulfilled Gillen's obligations, is paying the tort damages to Mina. Now F&D is sitting within the shoes of Mina and is able to proceed against potential sources of reimbursement. So would you say that if the underlying litigation with Mina had been a commercial lawsuit and there had been a surety that that would be analyzed differently from this case where the underlying problem was a tort suit? Your Honor, I'm not sure I understand your question. Well, the policy we keep talking about is that of compensating tort victims. Correct. There are certainly surety bonds all the time in commercial lawsuits as well. Somebody sends bad goods or somebody, you know, in some other way breaches a contractual arrangement, performs badly, whatever they do. So bonds are by no means a tort vehicle. They're a money vehicle. Well, Your Honor, there are performance bonds and there are payment bonds that are oftentimes issued on construction projects, but there are also commercial general liability policies here that go to. Right. And I'm just saying with this battle between who gets, you know, who's going to bear the loss actually of the fact that Gillen has no money, would that be analyzed differently if this were a construction performance bond? Your Honor, I don't think that the construction performance bond here, and I don't believe that there was one. No, I know there wasn't. I'm trying to get you to zero in on how important it is that the underlying case here happens to be a tort case, whereas in some other case, fidelity might issue a surety bond in a commercial setting. I'm just trying to tease out where does the tort aspect of this case matter. If you say it's the same analysis, they still prevail, then I'm having trouble seeing why the tort context matters. Judge, the tort context is important here because the underlying arbitration, or the arbitrators found that there was negligent design and installation committed by Gillen. That was confirmed by the Northern District of Illinois. In between that time, the coverage action was filed in the Western District of Wisconsin after initially being filed in the state court. I think it's very important to look at the prayers for relief and the complaints that were filed in that case. It's not merely a bad faith case. It's a case that's seeking indemnification and also defense costs. The indemnification is assuming that Gillen's going to actually have to fulfill the tort judgment for Minot, but that never happened here. F&D is the one that fulfilled Gillen's obligation to pay the tort judgment, and now it's been subrogated to Minot's rights to recover funds to be made whole. Our position here in our brief is that Article 9 never even comes into play because there has to be... Would you have thought of it as an Article 9 case if it had been a commercial judgment? Would that have looked more like just somebody extended credit to Gillen, failing to assure that there were enough assets to back it up because of the prior perfected security interest? Would that seem like a commercial... Your Honor, I don't really think it makes any difference whether it's a commercial judgment or not because the fact of the matter is that Gillen didn't pay the tort liability that it has. I don't think whether... It didn't pay the judgment that it had. The tort liability had been reduced to a judgment thanks to the arbitration proceeding and its confirmation, and Gillen doesn't pay. I mean, its first insurer pays up to the million-dollar limit, then there's the rest, and Gillen doesn't pay. Gillen doesn't pay. What happens, in fact, is that there is an intervening action filed by F&D and then an intervening action filed by BMO Harris, and, in fact, Mina is the tort victim, should have been named as a necessary party in the Wisconsin action, but that never happened. So when F&D comes in, F&D really is the necessary party on behalf of Mina. That's what happened here. Well, that's the issue, isn't it? I mean, I understand that's your position. That's the issue. One way of, I guess I'm thinking about this, is whether if the insurance company of Pennsylvania had simply stepped up, provided the defense, paid any necessary amount to settle with or reimbursed Mina, I don't think there would be – well, we obviously wouldn't be here, but I guess the question is whether BMO winds up benefiting in this because the insurance company apparently breached. Well, Your Honor, in response to that point, there was $1.2 million which was deposited on an interim basis with the clerk of court. Contrast to Appellant's argument, it wasn't written to Gillen. It was deposited with the clerk of court with the specific understanding that that would result in a release of the claims against the insurer. It's like an interpleader, but I guess in that case, though, Gillen's assets would never have been additionally pledged. There never would have been a bond, and so you never would have had BMO in a situation feeling that its security interest in those assets was being compromised. Right, but here with the insurance policy, there was no dissipation of either Gillen's or BMO Harris' assets because they never could have had an ownership interest in the funds that are payable to Mina. And on top of that, I indicated that the deposited funds are $1.2 million. Judge Randa was correct in finding that the first $825,000 was F&D's and F&D's alone. Well, that's the issue, right? That's the extra part of the judgment. Yeah, and then there's, Your Honor, there's a remaining portion that would flow to Gillen and in turn would flow to the bank. Well, that's the part that Judge Randa thought goes to BMO. That's correct, Your Honor. And we don't dispute the fact that the complaints filed by the bank contain allegations of a lack of a defense or that they contain bad faith allegations. I do think that the bankruptcy cases, the Edgeworth cases, are important with regard to the distinction between insurance proceeds payable to an intended third-party beneficiary versus a contractual right of defense or bad faith. We're not disputing the bad faith or the right of defense. We're talking about the portion of the policy that says we will pay on your behalf. That's exactly what the result is from the ruling that Judge Randa made on cross motions for summary judgment. It follows the policy principles of why these commercial general liability policies are enforced because they're not dissipating the assets of the tortfeasor. In fact, the bank is in a better position than it would be had the insurance funds not been ordered to be payable to really, in effect, Mina, F&D being the assignee. So at the end of the day, the bank is no worse off. They're seeking a windfall for something that they have no interest in. So we don't even need to reach the point of whether this is money under Article 9 or whether it's intangibles under Article 9. And I would also say that the bank has made the argument that merely because there's a settlement agreement that's been entered into, it somehow magically changes the positions of the party in the application of law. It doesn't. It doesn't. And do you have the authority Judge Easterbrook was looking for? Your Honor, I do have cases in my brief that cite to the equitable subrogation principles. It's very clear in Wisconsin law that where a surety has performed and paid another party's underlying primary responsibility, they have rights of recourse to either go against the principle on the bond here, which would have been Gillen, or to proceed against other third parties or obligees to be made whole. And that's exactly why F&D filed their intervening complaint in the Wisconsin District Court coverage action. I mean, you've asked a couple questions trying to make distinctions between commercial policies and otherwise. If the panel could imagine if somebody had been seriously injured on a construction site as a result of the negligent installation or design of Gillen, was not able to have their judgment satisfied while on appeal, and then the surety ends up paying that, or there's not a surety involved, even worse, that very injured person could be out. Because under the bank's argument, if there's a settlement of an insurance coverage claim, the bank gets all the money. That can't possibly be what the purpose of these policies are. Unless the court has additional questions. Apparently not, so thank you very much. Thank you. We might have a tiny bit of time left, Mr. Kroon. Does he have anything? Okay, well, I'll give you a minute. Very briefly, just a couple of points. The satisfaction of judgment appears in the record at appendix page 25. At appendix page 32 is the stipulation between the parties that, and I'll just recite it, and ICSOP reached a settlement agreement of the coverage action by which ICSOP would pay Gillen $1,200,000 contingent on ICSOP's receipt of satisfactory releases from the parties. The tort victim direct action, as I've thought about it more, Judge Easterbrook, if Gillen were to file a bankruptcy, I think a court would still have to decide this issue of who gets it, whether the tort victim or the lender trumps. I'm sure a court would have to decide. I just don't think there's any doubt whatever about what the decision would be under Wisconsin law. And I respectfully disagree. Just because you have the ability to bring a claim against a tort victim doesn't resolve ownership rights of it. And I would submit finally that the Tri-Valley case is really the most analogous case. It's in the nature of an interpleader in the context of a bankruptcy, and the decision there was that the negotiated settlement of the coverage dispute were assets of the estate. Okay. Thank you very much, Mr. Kirtley. Thank you, Mr. Hummel. We will take the case under advisement.